All right, before we call our next case, I should have done this sooner, but I was very excited because Judge Chen had his motion to move his clerk in. We thank Chief Judge Barnett of the Court of International Trade for joining us here today and sitting on these cases with us. So, thank you for coming. I'm sorry I didn't do it at the outset. I got distracted. So, okay, next case for argument, 23-2349, Taction Technology v. Apple. Mr. Bash. Thank you, Chief Judge Moore. May it please the Court. The principal error of the district court below and the one that we believe alone requires reversal is to find a clear and unmistakable prosecution history disclaimer of devices that produce output that is not highly damped. That language does not appear in the claims. It does not appear in the specification of the patents in suit or any of the patents in the family. It does not appear in the file history of the patents in suit, but rather in a single reference in the file history of a parent application. We believe that the district court misunderstood the colloquy between the applicant and the examiner in that case. So, let me take the court right to that application, right to that part of the file history. That's at pages 1049 to 1050 of the appendix. There's an initial statement that the application is distinguishable from the Morris prior art reference because the Morris prior art reference involved high resonance, whereas this art is directed to highly damped output. Let me bracket directed to for a second. I want to come back to that. But then the applicant goes on to say, we've proposed an amendment to this claim language that we believe overcomes the Morris objection. What that amendment did, among one other thing, was say that the claim requires some damping. It did not say it requires it to produce highly damped output. Then, and this is at page 1072 of the appendix, the examiner said that change to the claim language overcomes the Morris prior art reference. It overcomes the objection. So, let me take you back to what the district court found to be the disclaimer. That one sentence at page 1050 of the appendix. I'm just curious about your view. Is it possible, in your view, for a statement to be made by an applicant in an office action response that says something that's clearly narrower than whatever is in the claim or in the amended claim? Can that serve as a disclaimer and a narrowing? We don't doubt, Judge Chen, that in some cases there can be a disclaimer in the circumstances you describe. But here we think virtually every consideration that this court's precedents have looked to for disclaimer disfavor that finding. Let me explain what I think was going on with that sentence. It's curious that the sentence uses the phrase directed to. In the cases that Apple cited and that we found, at least, disclaimers have sometimes said things like this invention is, or all embodiments of this invention are. The directed to language, as far as we can tell, is unusual. And what we think that was getting at is the aspirational goal or what the invention can achieve. And there's two reasons we think that. One, what's block quoted right under that sentence, this is at page 1050 of the appendix, is a portion of the specification that one is describing a particular embodiment of the invention, not the invention as a whole. And two says the phrase can be damped. And what this device does is it has a damping mechanism and that it enables the person practicing the invention through experimentation with the level of ferrofluid and the viscosity of the ferrofluid to achieve different degrees of damping. And we think that understanding of what the applicant was saying has very strong support in the specification. So the parties have joined issue on figure 5C and the discussion of figure 5C in the common specification, that's on column nine. The patents start at 109 and 134 of the appendix. Mr. Bash, I think that you've spent a lot of your argument now on this disclaimer question and we, I think, have your argument on that. I think it might be useful if you move to some of your other arguments. Sure, Chief Judge Moray. Just to set forward the decision tree as we see it, if we win the argument we've just been talking about. Yes, but if I was trying to move you to the other arguments, that might be a signal to you, right? So move to the other arguments. Okay, so we have two. If we lose the highly damped output disclaimer, we have two arguments we both need to win. So one of them is that the district court erred in granting summary judgment on that basis because it misapplied the local rules. And the other is that the other two, what I'll call subsidiary disclaimers of subsidiary constructions were erroneous. Unless the court has a preference, let me take the second of those arguments first. So the district court first found that it construed highly damped output to require a mechanical damping. So not electric damping like the closed loop controller at issue in this case. The parties now agree that that can't be a standalone disclaimer. It is at best a construction of highly damped output. The short answer as to why that cannot be correct is that the manner in which the output is produced, whether by mechanical damping or is damped, whether by mechanical damping or otherwise, is not a resolution of ambiguity in the phrase highly damped output. It's not a linguistic construction of highly damped output. Highly damped output refers to the- And I suppose these two supporting passages in the specification that are quoted in the office section response describing a highly damped output, they say nothing about the manner in which the damping is to occur. Is that right? That is correct, Your Honor. What the district court and Apple have picked up on is a couple of references to, or maybe one reference to the lack of mechanical damping in one of the prior art references. This is in the common specification. But elsewhere in the specification, one, it distinguishes just undamped devices, devices that have no damping whatsoever. And then at column two of the specification, this is right at the top, the specification says that the damping can be achieved by any suitable mechanism. Now, what Apple has said is that, well, then it gives a list of exemplars and all of those are mechanical. Do you have to win on both the mechanical damping requirement and the less than two factor of 1.5? Judge Chen, if we lose highly damped output, in other words, if this court finds that to be a proper disclaimer, yes, we would have to prevail on both of those because the district court said these devices don't satisfy either of those and we haven't appealed that aspect of judgment. So the basic point on the lack of mechanical damping is that that is not a resolution of ambiguity. Now, what Apple has said is that... Okay, I think we have that one. So why don't you move on to the next one? Sure. So the other limitation, the other subsidiary limitation is the Q factor must be less than 1.5. That depended entirely in our view on misreading one passage of the specification. This is at the bottom of column two of the specification and it was distinguishing a prior art device referred to as an ERM. What the specification says is that that device lacked a means for critical damping or a mechanism for critical damping. And as a result, the Q factor of the oscillating piece in that device was 1.5 to three. Critical damping means 0.5. If you think about the swing with the kid, critical damping is pulling the swing back and it gets to the center as fast as possible but stops. What was being disparaged in that prior art was the lack of any mechanism for damping at all. It wasn't saying 1.5 is the magic number. It was just saying that those devices based on their innate characteristics had a Q factor of 1.5 to 3.0 minus any damping mechanism. It was distinguishing about prior art was this part. If that prior art embodiment had no damping and had a Q factor of 1.5 to three, then you would think any kind of damping would have brought it down under 1.5, right? That's true. But what was missing with that piece was not that it had a particular level of Q factor. What was being distinguished was that there was no damping mechanism. And the claims themselves deal with that because the claims require a damping mechanism in the form of flare fluid. It was not saying that 1.5 is the magic number. And by the way, even if... And I don't really take Apple to disagree much with our reading of that. But even if we're wrong about that, what this court has said for prosecution history disclaimers is that there needs to be repeated disparagement. That's the only instance in the specification. There's nothing else in the file history. We've given the host... One clear disparagement is not good enough? Well, this court has said in cases like Chicago Board that you need repeated disparagement. Now, of course, we think the court was not even reading that passage correctly. But if this court disagrees with us about that, what the court has said in cases like Chicago Board is that you need repeated disparagement. In addition, cases like Polytech that the parties have cited in the briefs, usually that disparagement is twinned with some explanation for how the patent claims solve for that problem. But let's assume that the district court in this alternate court grounds went too far on requiring mechanical damping and also went too far on having a specific Q factor value. Then the other thing is the exclusion of the expert report. And could you just comment on that? Yes, Judge Shen. So one, and we've made this argument in the brief, we think that if the court reverses the claim construction issues you just referred to, one option would be to remand for the district court to conclude whether a modification in the claim construction is a different result than the expert report. Oftentimes, once courts modify claim construction mid-trial, they go back and consider. But even if the court... My understanding of the district court's order, correct me if I'm wrong, is there was one ground and then a second ground. And then the one ground, which dealt with exclusion of the expert report, had nothing to do with these additional constructions that required mechanical damping and a certain Q factor. Am I... That is correct, Judge Shen. So if the court goes along and reaches that question, we think there were a few problems with what the district court did. First, it's construction of the local rule. The Southern District of California local rule requires the plaintiff to identify where in the asserted devices or in the accused products the various elements of the patent claims are met. It does not say how. And that is in distinct contrast to the Northern District rule, which says where and how. Now, my friends have cited some district court cases prior to this case that construed the Southern District of California rule to also require the how. There's three things I'll say about that. One, I don't think it's the burden on parties to go through non-binding precedent of other district judges in the same district to determine whether the plain text of the rule has a different meaning than what it appears on its face. Two, one of the lead cases they cite is a case called Amaranth. Two things about that case. One, it relied almost entirely on Northern District of California precedents for this point. Two, although in fairness, it did not arise in a summary judgment posture, it gave the party leave to amend the infringement contentions. It didn't say your case is over because you didn't know that you had to say how. I guess at the bottom, two things. One is we're dealing with an abuse of discretion. I take your point that the Southern District of California's local patent rule doesn't say where, or it doesn't say how, it only says where. But at bottom, the question is whether the expert Dr. Oliver was presenting a new different infringement theory than the one that was contained in the final infringement contentions. And could you just speak on that? Why it's fair to say that what Dr. Oliver was proposing was in line, or should have been understood to be in line, and it was an abuse of discretion to find otherwise with the proposal it made in the final infringement. Yes, Judge Chen. The key paragraph is on page 3751 of the appendix. That's the paragraph from our final revised infringement contentions. And what it says is, if highly damped output is a claim limitation, it is satisfied by the closed-loop controller. Then it says so too. Does it say it's satisfied by the closed-loop controller? I mean, remember, it makes an observation that Apple's products have something called a closed-loop controller. Well, I can pull the exact language in. It's reproduced in our reply brief. But it refers to the closed-loop controller, and then it refers to our frequency response graphs, which are what show the effect of the ferrofluid. And then it says that highly damped output can be satisfied by any mechanism. The district court took issue with, one, the fact that I guess that didn't say directly these things combined to satisfy that effect, and two, that in trying to give some understanding to this term that has no clear meaning in the art, our experts said, well, if something's generally uniform and flat, that would be highly damped output. Could you explain a little bit more about the graph that Dr. Oliver relied on that showed a flat line or a substantially flat line? So what's the y-axis representing? Is that representing something different than what was shown in the frequency response graphs in the final infringement contention? My understanding is they're the same. They show the amplitude of the oscillation. I'll go back and confirm that I'm correct about that. The reason they're different is because the earlier graphs showed only the effect of the ferrofluid. Once the highly damped output limitation was in place, the latter graphs showed the effect of both, because now we had to satisfy this new highly damped output disclaimer before we only had to show that ferrofluid. I guess what I'm wondering is how come you didn't have that graph in your final infringement contention and instead used the other infringement, the other graph from your initial contention, showing that the two peaks, one smaller than the other? Well, I don't even think Apple has argued this. I don't think our response, our responsibility at that stage in the final infringement contentions was to show the full extent of our experimentation and analysis. What we did was identify that these two elements, the ferrofluid and the closed loop controller, contributed to the highly damped output and we said that it could be satisfied by any mechanism. I don't mean to nitpick, but I seem to recall your final contention saying, here, the ferrofluid, look at our frequency response graphs, which show a highly damped output. And so then you look at the graphs and then we see the peaks, a lower peak, which to me seems to, on its face, suggest that the plaintiff's theory for what is a highly damped output is a peak, albeit a lower peak than what it would be otherwise. Chief, there's more. May I respond? Yes, please. Your Honor, at page 3751, that's the paragraph we're talking about, the first point that's made is about the closed loop controller, not about the ferrofluid. Then it says, so too, the frequency response graphs demonstrate this. And then it says, and it could be satisfied by any mechanism. So I think a reasonable understanding of what we were saying was that they both contribute, but maybe, and I'll end on this point if I have leave to do so, it's strong medicine to say, because we didn't precisely say combined, our entire case ends. That's cutting it pretty slim, especially in light of the fact that the rules do not actually say how, they only say where. So we would ask the court to reverse. I see I've not saved any of my time. No, I'll restore some. Thank you. Yep. Ms. Postwick. Thank you, Your Honor. May it please the court, the prosecution history. Can we start where we ended? How, where? Yes, Your Honor, absolutely. So first I want to note, as this court has held in many cases, including the Figenics case that is cited on page 27 of the opening brief, a district court gets deference in both its interpretation and application of its local patent rules. That's true, but when we're trying to think about what the rules say, they supply a very important notice function to the parties. And the notice that the rule supplies is pretty clear. You just have to identify where. You don't have to identify how. But what's equally clear, Your Honor, is a decade of precedent from the Southern District of California that uniformly interprets it to require not simply respectfully. I don't see a decade of precedent. Every case you cited is unprecedented. Some of them are magistrate judges, not even district court judges. And on top of all that, two of them are not even interpreting 3.1. They're just talking about, in general, let's see, foot balance and anti-cancer are just talking about, in general, how to do infringement contentions. They're not offering an interpretation of 3.1. They don't even quote or cite it or purport to offer an interpretation of 3.1. So show me the decades of precedent that I'm missing. And show me one precedential decision. Show me how they're on notice. I apologize, Your Honor. I said precedent. There is a decade of consistent case law interpreting this. How many cases? How many cases? You cited two by magistrate judges, and they're non-prec, and two of them don't even mention or quote or cite the rule itself. I'm sorry, Your Honor. They're also in the district court's opinion. I think one thing I would like to highlight in terms of the notice function, Taxon knew what these cases said. Taxon itself relied on, for example, the Clinicomp case, which is one of the cases, one of the non-precedential decisions that we have cited. Taxon successfully relied on that case and many others in its own motion to strike Apple's invalidity, attempt to supplement its invalidity contentions for going beyond what had originally been disclosed. That happened before the motion to strike that's at issue in this case. It happened before they served Dr. Oliver's reports. The idea that they had to somehow scour the precedent, they knew it was required. I don't see them ever acknowledging at any point that they are required to meet this how limitation. It seems to have come out of the blue. I don't think that's a fair characterization. They had the cases. They relied on them. Yes, it was invalidity contentions. No, they didn't rely on them for that purpose. They did not rely on them for the notion that they have some obligation under the local rules to meet an additional how standard. I think that they certainly had the notice of what, if we're hung up on the word how, I think what's important is that they understood the substance of it. I'm not hung up on the word how, Ms. Boswick. I'm hung up on the rule. The rule says where, and guess what? The rule in an adjacent court says you have to prove how and where, and so it's not the word how. It's the rule. The rule says what they're required to proffer in infringement contentions, and I think that they complied with what that rule requires. So the district court here disagreed. It gets deference. It relied on cases that- But do you agree that the district court only disagreed because it concluded they were required to also prove how? No, Your Honor. He also found that they hadn't shown where, and specifically- Let's go to page 57. ...of his decision. Sorry, JA57. Where in this decision does he say they didn't show where? Because it looks to me, he says, taction needed to identify not only where in the accused products, the highly damped output limitations fell, but also precisely how those components satisfy the limitation. Taction failed to provide the requisite how in its final infringement contentions. I don't see where he took issue with where, and then in the footnote, look down below in the footnote, he says, you know, look, I get that the California rule in one court requires how and where, and here it only requires where, but we require how and where, and then he cites to Ameren, which is a non-precedential decision by a magistrate. Yes, Your Honor. I would direct you earlier in this opinion at appendix 55, so he identifies two errors, or two significant differences between the final infringement- Where on page 55? I'm looking at the bottom. It says- Line number. Line number 26. First, taction never expressly asserted or explained in its contentions that it is the closed-loop controller combined with the ferrofluid that satisfies the highly damped output. That's the failing of where, and then the second is- That's a problem. Where is where, right? They absolutely do on page 3751, and it cannot be disputed, identify the closed-loop controller and identify the ferrofluid, both of which they expressly indicate contribute to damping. 100% that. They do that. Like, you can't deny that. Look at 3751. What am I missing? I would respectfully disagree that they've clearly identified that the closed-loop controller is linked to the highly damped output. No, not highly damped. Damping. I said damping. But we're talking just about the highly damped output requirement. This is the disclaimer that the district court found is that separate from the claim language, right? Apple tried to argue this was an interpretation of the claim language. The district court instead found there is simply a disclaimer of the invention requiring highly damped- I don't want to talk about the disclaimer. I can be more clear about that. To the extent that the court's statement concerning- I'm sorry. I'm going to be clear. I'm reading from 3751, line 5. To the extent the court's statement concerning transducers with highly damped output is ultimately imposed as a requirement, taxon contends the taxon engines and the accused products are transducers with highly damped output. Apple itself, for example, has stated the frequency response is controlled, including the frequency response at the resident frequency through the use of the closed-loop software controller. So how is it they have not linked the closed-loop software controller directly to highly damped? I would say that sentence doesn't talk about highly damped output, whereas the sentence about the furlough- For example? Wait, the for example? What for example? The sentence begins with for example. What other example could there be referring? For example, something I'm not talking about anywhere. The prior sentences are highly damped output. For example. I think, Your Honor, it's difficult to understand these contentions as referring to the closed-loop controller contributing to the highly damped output when they are using frequency graphs that were created by taking the closed-loop controller out of the system and looking only at the furlough. If the court disagrees, if the court thinks that the district court abused its discretion in this finding, then there are two other reasons why if you uphold the disclaimer of highly damped output, the district court's decision should be affirmed. They are the mechanical damping issues and the key factor issues that we talked about. Just out of curiosity, page 3751, what is the bolded title of this paragraph? Transducers with highly damped output. Yes. Wow, look at that. Understood, Your Honor. But again, in context, I think when they're talking about testing that didn't involve the closed-loop controller at all, and then they come back with an expert report that is a complete 180 from these that depends entirely on the closed-loop controller. Let me ask a hypothetical. Yes, Your Honor. Okay, what if we think there's a prosecution disclaimer? Yes, Your Honor. But also, what if we don't like the extra constructions requiring mechanical damping or a particular Q factor value? Yes, Your Honor. And we also think the judge went too far in demanding where, I mean, sorry, demanding how the claim elements are all met by the accused product. But we can't tell if, based on this order, whether there's a separate standalone ground for other reasons why there is a justification to exclude the expert report. Could we vacate and remand for a second look at whether or not Dr. Oliver's expert report on highly damped output should be excluded or not excluded? I think that's certainly an option that's open to this court. I think that if the court were to say that actually the Southern District has misunderstood its rules and that they don't require a how, then certainly the district judge should be given an opportunity to apply that standard in the first instance. Our position is that it's clear from his opinion that he did not find the where met because he did not find it to be the same theory of infringement from the final infringement contentions to the expert report. And that is really the critical difference here. Yeah, there's some confusion because at 857, the district court does say because there was a failure to identify how in the final infringement contentions, I'm going to strike Dr. Oliver's expert report. And so it's kind of interesting that because in the district court's view there was a defect in the final infringement contentions, he's going to exclude this expert report over here. I think that that's pretty typical. Again, I would point out Taxon has asked this court for leave to amend its contentions. It never asked the district court for that. So the idea that this is too harsh a remedy. Also again, Apple's supplemental invalidity contentions. Ms. Bossert, did you tell me that you didn't understand this paragraph despite the title, transducers with highly damped output at page 3751? Did you tell me that you did not understand this paragraph when it talked about the closed loop controller to be asserting that the closed loop controller was integrated as part of the highly damped output? Is that what you told me? If I said that, I misspoke. I understand that we recognize they referred to it. What we didn't understand. I want to point you to, you did say it. Yes, I definitely said it. I agree. Let's look at page 4967. Yes, Your Honor. Page 4967. Does or does Apple not say at line 5, taxation's infringement intentions appear to rely on Apple's closed loop controller for this limitation? Yes, Your Honor. Highly damped output. Yes, Your Honor. And what we didn't understand was both the combination of the two and particularly how that could be a theory of infringement. So do you now agree that the where is met? No, Your Honor. The district court didn't conclude the where wasn't met? No, Your Honor. Because it's the combination, the two things combined. We did not say we understood them to be relying on that. And again, that wouldn't have made sense when they're relying on frequency graphs that were created, that just, they took the Taptic engine out of the device. They put it on an electrodynamics shaker. Instead of using the closed loop controller software to provide this input signal to the Taptic engine, they used the electrodynamics shaker. And they measured it with and without the ferrofluid. So they are eliminating the closed loop controller from the system in order to show a highly damped output. You can't read a theory from a theory of infringement from that that nonetheless relies on a closed loop controller. In contrast, Dr. Oliver's report does the opposite. He goes on for 50 pages with a whole set of new texts and software that he wrote that solely control the closed loop controller and don't measure the effect of the ferrofluid, including because he said, I think the question came up in the opening argument, did you use those frequency graphs in Dr. Oliver's report? No, they didn't. Because Dr. Oliver opined that those graphs did not show a highly damped output. Now, counsel, I know you wanted to start with your strongest argument, which is page 1050, disclaimer. And I got you out of that for the obvious reason, I hope now to you, which is don't waste your time on an argument that is your strongest. Let's focus on the ones that I'm struggling with, right? So hopefully you get it. But I do want to give you a chance to go back to that argument at page 1050. And here's why. I want to ask a question. I want you to open it up, your appendix to that page. So when it says applicant invention in contrast is directed to transducers with highly damped output. I like the district court. I see that. And that sure looks like a disclaimer to me. One of the questions I have is, is that a disclaimer only as to claim 15, that particular language? And in particular, is it, should it travel along with the amendment that was made? And what I mean by, and by the way, let me just say, I've tracked through this case. And I think all your asserted claims have nearly identical in substance, the 40 to 200 hertz, the whole, all that language, right? But I guess what I was wondering is when a statement like this is made in the context of discussing a new amendment to a particular claim limitation, does that statement affect all claims globally such that now every single claim that could ever spawn from this invention must have a highly damped output? Or does it only affect claim 15? And progeny that have carried through the similar language? A couple answers, Your Honor. I do think it should affect, in this context, it should affect all the claims coming from this common specification, right? This is the parent application to both the 885 and the 117. So it's an identical specification. And the statement is, applicant's invention in contrast is directed to transducers with highly damped output. And that's in the context of a specification that consistently says the same thing, that consistently criticizes- Okay. And maybe that, the fact that you're saying in conjunction with the specification, because my other problem, you're right. If that statement was the only one like it, like it was a zebra with polka dots, I would be like, yeah, that's a disclaimer. But page 1051, when I read the rest of the response, I found that the applicant, and he didn't make this argument. So if you're not prepared to discuss it, I'll forgive you. I mean, it is a question of law and I read the whole response. So the very next page, page 1051, they use this language again, right? Applicant invention in contrast specifies several important aspects. And what these aspects are directed to is the headphones, right? The cup-like shape of the headphones. And I thought, okay, clearly not every claim in this patent requires cup-like shaped headphones. And that's the limitation that was added for claim 16 using the identical language. So while in general, I'm a big fan of, if you say the invention is, or the invention is directed to, or whatever, you now are stuck with that for all your claims. This applicant seemed to use that language repeatedly when clearly they weren't meaning to limit all claims. I mean, in a way, an ordinarily skilled artisan, I don't think an ordinarily skilled artisan would read the language I just pointed to and conclude that this applicant intended every single claim to have headphones with cup-like shapes. Do you understand? Uh, I do. May I respond? Of course. Before we let him go over, you go over too. Be sure, Your Honor. Yes, and I think the context is critical. I don't think we're asking for a bright line rule that anytime someone says, my invention is this, that you get a disclaimer for all purposes. But we are talking about this, this disclaimer, this statement made in the prosecution history as to a patent that, again, throughout the specification talks about the importance of substantial uniformity of the frequency response, which Taction now agrees because it successfully argued to the district court is synonymous with highly damped output. You have every embodiment showing substantial uniformity. You have criticism of the prior art for not being sufficiently damped. I think in this context, when the patentee, along with all of those disclosures, comes in and says, applicant's invention is directed to transducers with highly damped output, they should be held to that representation. Okay, that's very helpful. Do you have anything further? Oh yeah, you look like, go ahead, just jump on in. If it's just, we can stop. Oh, okay. Thank you. Thank you, Ms. Foxwood. Mr. Bash, I'm going to restore three minutes of rebuttal time. Thank you, Chief Judge. I just want to make a handful of points. One, we agree with Apple that if the court concludes that the two, what I'll call, subsidiary disclaimers are invalid and that there was at least some error in the district court's treatment of the infringement contentions in the expert report, but you're not sure if there were other grounds, vacater and remand would be appropriate. The one thing I wanted to bring to the court's attention is we did make the argument below that this was not an appropriate basis for summary judgment. If you look at Appendix 59, that's part of the striking of the report. So what we argued below is that Apple should have raised any issues with the inadequacy of the- Did you make that in your opening? We, yeah, in our opening- Your argument here, did you give Ms. Foxwood a chance to respond to this argument? In our opening brief- No, I'm not asking about your brief. I'm saying an oral argument. When you stand up and you present issues, do you understand that then she's kind of confined to those issues? Yes, and in my colloquy with Judge Shen at the conclusion of my argument earlier, I argued that summary judgment was too strong of medicine for what is at most a reasonable disagreement about procedure requirements. I'm just showing the court where we preserve that argument in the record. It was made in a slightly different way. That's fine. I just want to make sure that fair is fair. On highly damped output, I know that's not what the court wanted me to focus on because, Chief Judge Moore, you had a colloquy with my opponent about it. I just want to remind the court, I know the court knows this, if we have any reasonable reading of that disclaimer that's not- or any reasonable reading of that sentence that's not a disclaimer, that's enough for us to prevail. It's a clear and unmistakable standard. This court has said any reasonable reading defeats a disclaimer. And Chief Judge Moore, to your question specifically, might this have been specific to claim 15 of the 394 application in our opening brief? We have made that point a number of times. One point we've made on that is that claim 15, and this is at page 1062 of the appendix, had an additional element, an apparatus for imparting vibratory motion to the at least one vibration module of a user's skin. It goes on. The point we've made is that if you looked at the specification about that sort of application of this, there are additional components that might serve to have further damping when it's talking about something that goes against somebody's skin. So that could at least reasonably, and that's the standard here, account for the highly damped output disclaimer. And again, of course, just to remind the court, our view is that that is talking about the purpose of the device, what can be achieved. That's consistent with the specification. It's also consistent with this court's cases like Copaxone that say that even- Counsel, this is a very poor use of a very short amount of time. Well, let me just add the last point, which is that counsel didn't have a chance much to talk about the mechanical damping and Q factor limitations. The Q factor does not satisfy the clear and unmistakable limitation standard by any stretch. The district court, in our view, respectfully just misread a single passage. The mechanical damping limitation is not in any way- I'm sorry, counsel, your time is up. Thank you, Chief Judge Moore. I thank both counsel. Case is taken under submission.